Good morning. Can you see that? Mr. Clair, please call the case. Case number 11-3432, James Jenosek v. Michael Slotky. Counsel, if you could both approach and let us know who you are and who you represent. Good morning, Mr. Justice. My name is Tom Kanyo. My name is Tom Jenosek. I represent James Jenosek. Kanyo? Kanyo. K-A-N-Y-O-C-K. Okay, great. Who's going to be arguing? Good morning, Judge Genevieve Daniels on behalf of Bureaus Investment Group, LLC. And good morning, Your Honor, I'm Martin Tully with Katniss and Rosamond on behalf of Appellant Michael Slotky and Bureaus Investment Group III, LLC. How are you guys going to figure out who's going to argue and how long and what not? Your Honor, what we propose is that I will be arguing on behalf of two of the appellants for 15 minutes in the main argument portion. Ms. Daniels on behalf of FIG will argue for the remaining five and then we will address rebuttal when that time comes. Okay. That's fair. Also, by the way, this is not the Republican National Convention. I'm not finished with talking to the empty chair. Justice Smith had a very urgent family medical matter to deal with today and is unable to be here today but is going to listen to the arguments and has already considered the briefs and will be actively involved in the decision of the case and offers his apologies for not being here today. Okay? Well, thank you. Great. Thank you. Okay, counsel, please proceed. One other thing, the microphones here are for recording. They don't amplify, so keep your voice up. I will use my courtroom voice, Your Honor. Good morning, Your Honors. May it please the court, counsel. Again, my name is Martin Tully and I represent Bureau's Investment Group, 3 LLC, as well as Michael Slockey, two of the appellants in this matter. Our briefs address the errors that were committed by the Circuit Court in entering the October 14, 2011, discovery order that we have appealed from on an interlocutory basis. The errors can be grouped in basically two categories. First, the Circuit Court made certain findings of fact without actually finding any facts and did so both prematurely and without any evidentiary record. Those findings appear on page two of the October 14, 2011, order and are laid out at page nine of our opening brief. Second, the Circuit Court then went on to misapply the law to those findings of fact to wrongfully compel the production of 851 privileged documents, privileged documents that not only span attorney-client communications, but also attorney work product, including work product pertaining to this very litigation, as well as attorney-client communications that do not pertain to this case, but other matters that are not with respect to the parties in this case and even with some other lawyers. The Circuit Court, I'll address the findings of fact or the non-findings of fact first and then the misapplication of the law to those facts. The Circuit Court erroneously and needlessly premised the discovery order on findings for which no evidence had been presented. These findings regarding Mr. Janosik's membership in BIG, and I will refer to Bureau's Investment Group LLC as BIG and Bureau's Investment Group III LLC as BIG III, if that's okay with the Court. The Circuit Court's findings with respect to Mr. Janosik's membership in BIG were improper and premature, and in order to understand why that is such a serious error, one needs to understand how it is that we got to this point in the case. Again, we are here on a discovery order. Mr. Janosik's, the issue of Mr. Janosik's, let me back up a minute and actually explain something here. Mr. Janosik brought his claims in this case in a manner that created an unusual dichotomy that contributed to the errors committed by the Circuit Court. You're speaking about pleading hypothetically and in the alternative? It's actually more than that, Your Honor, because in count one, very first count, his principal count of the verified complaint, and it is a verified complaint, that complaint and that claim is against BIG and alleges that Mr. Janosik was dissociated from BIG as of October 1, 2007 and seeks from the Circuit Court a declaration to that effect and all the consequences that go with it. In the alternative, Mr. Janosik's remaining counts of his verified complaint are against the Slotke's and BIG 3. And when I say the Slotke's, I'm referring to Burton Slotke, who is also a defendant, but not on the palance here today. The remaining counts of the verified complaint are against the Slotke's and BIG 3 and those alleged that Mr. Janosik is still, to this day, a member of BIG and sets forth various grouses against the Slotke's, alleging mistreatment of him as a member of BIG. So the dichotomy here is that Mr. Janosik simultaneously both sues BIG and purports to sue on its behalf. And this is an artifice that led to some of these errors. Now, this is important to understand, Your Honors, because what this means is that Mr. Janosik's status is inextricably intertwined with the issue of whether or not he's a member of a control group, whether or not he's a current member or a former member, whether or not he can request access to certain information, whether he does or can claim that he participates in a privilege. These are all threshold issues that have to be addressed that all stem from his status as either a member of BIG or a former member of BIG. Why then did you admit that he was, that he is a member of BIG? Well, let me address that, Your Honor, because we did admit that. The position that, and I won't speak on behalf of Ms. Daniels because she represents BIG, the position that the defendants have taken from day one is that in count one of the complaint, Mr. Janosik fails to allege any facts that under the Illinois LLC Act and the operating agreement for BIG would have led to his dissociation. Therefore, in the absence of those allegations, he's still a member. But here's the issue, and I know that Mr. Janosik takes issue with this, and the circuit court raised this as well. What is an admission? An admission is something that would take an issue out of dispute in the case, and the case could proceed on the basis of that fact being resolved for all purposes. We do not have that here, Your Honors, and that's the problem. Are you saying that an admission cannot be used by the court in order to facilitate discovery? I think an admission, the purpose of an admission, Your Honor, is to take a fact out of dispute for all purposes. The problem here is it was taken out of dispute for a very focused and premature purpose, and that was to rule on whether or not Mr. Janosik could participate in a privilege as either a former member or a current member. The circuit court assumed that Mr. Janosik is a current member of BIG. If that is a fact that has been taken out of dispute. That assumption was based on the way that the complaint was answered. I mean, if the defendants had answered the complaint saying that they have insufficient information, and neither admit nor deny but demand strict proof thereof, you might have been in a different position in the circuit court. Don't you think? Actually, I don't, because we're talking about an issue here of privilege, and we're talking about an issue that did not need to be addressed by the circuit court at this stage of the case. In fact, we begged and pleaded the circuit court to address the threshold issue of Mr. Janosik's status for the entire case. From that point on, the issue of whether or not he can or cannot participate in a privilege, what access to books and records he may have as a current or former member of BIG, could be decided rather easily. We've asked for that threshold question to be resolved at multiple stages throughout the years that this case has been pending. For it to be resolved in this context, at this time, needlessly, when the issue of attorney-client communications and privileged work product risks being exposed to someone who… You're asking the court, for the sake of judicial economy, to have a hearing, to take evidence, to come to a conclusion, to make a finding that you admitted in your answer. Why? Why should the court do that when the court is using your admission as a basis to decide whether or not privilege applies? That seems reasonable to me. Well, and here's why it isn't, because we're talking about privilege. If we were talking about the merits of the case, Your Honor, I noticed that in Mr. Janosik's brief, he actually states that he's judicially admitted that he is currently a member of BIG. If that's the case, if that's the case, then we can stipulate that right now, and Ms. Daniels and her client can go home. But we don't have that situation. In the context of privilege, this creates a very severe risk of prejudice to the defendants, and here's why. Because if, for purposes of this discovery order, we are compelled to produce 851 privileged documents to Mr. Janosik, and if he is allowed to maintain in his verified complaint his very first count that he is not currently a member of BIG, and that he ceased being a member of BIG as of October 1, 2007, and if that is the judicial term of determination on the merits later on, we have now disclosed privileged communications, including, Your Honors, returning work product with respect to this very lawsuit to Mr. Janosik, who basically was not a member, wasn't entitled to them. That risks a waiver, not just of those documents, as to him, but as to third parties, as to subject matter. In terms of the documents that relate to this specific lawsuit, is there a cutoff as of the date that Canton was disqualified from representing BIG? That's a good question, Your Honor, because there are different timeframes here. The Circuit Court basically compelled three categories of documents to be produced. All of them are privileged, and all of them, by the way, were found to be privileged and properly logged under Illinois Supreme Court Rule 201N. So it's Mr. Janosik's burden to prove that there is some exception to why they are not privileged and should be disclosed. The first time period was prior to October 1, 2007, when it is undisputed, for all purposes, that Mr. Janosik was, in fact, a member of BIG, which is a member-managed LLC under Illinois law. That's undisputed. Excuse me, he was also still the president of TBI at that point. Up until October 1, 2007, that is correct, Your Honor. Thank you. As of that date, his employment with TBI ended. What is still disputed is whether he remained a member of BIG after that date. On 40% of the shares, right? That's actually the dispute in Count 1. Okay. Does he continue to be a 40% member as of today, after October 1, 2007, or not? Count 1 asks a declaration from the circuit court that he is not, and insists that he was dissociated, and therefore his share, his interest needs to be purchased by the company. That is the gist of Count 1. Under the statute, of course, once you dissociate, the various rights that you would otherwise have under the LLC Act terminate. And that is, of course, what begs the question as to what is his debt. Is he a current member or a former member? To answer your question, Your Honor, the next period that the circuit court compelled the production of documents for was from October 1, 2007 until February 10, 2010. February 17. Thank you. February 17, 2010, Your Honor. And the reason why the court compelled the production of those documents, according to the discovery order, was under the argument that there was a dual representation doctrine applied, or that there was an absence of an expectation of privacy by the defendants, such that they couldn't invoke the privileges to Mr. Janosik. Right. That period, of course, encompasses this litigation. The lawsuit was commenced in July of 2009. So from July of 2009 to February of 2010, we're talking about attorney-client communications and work product with respect to this lawsuit. And we'll come back to the higher standard that applies with respect to ever being able to obtain this information. I know this court's decision in Garvey laid out the higher standard and the showings that need to be required for someone to obtain access to attorney-client communications and work product if you're dealing with someone who's a member seeking access to that information under the Illinois LLC Act. So the problem, Your Honor, is that we're talking about attorney-client communications here. We're talking about attorney work product. There is no reason for this decision to have been made at this point in time at this juncture in the case. The better approach would have been that that was followed, for example, in the court that we cited in our briefs, in the Zivaki decision or in Bean v. Bean, which is a decision from outside of Illinois. In both those cases where it was clear that the question of whether or not a person's membership in the entity was at the heart of the case, related issues were deferred until that decision was decided on the merits after an evidentiary hearing. Our main request is that this court reverse the decision of the circuit court, remand this matter back to the circuit court for direction to actually decide the issue, say on summary judgment, of what exactly is Mr. Janosik's status as a member or a non-member of Bureau's investment group. On that evidentiary record, then, if necessary, this question could be revisited. But to take that position now. Had you ever filed a motion for summary judgment? We had not filed a motion for summary judgment, Your Honor, but let me let this court know that in the time that has passed since this issue first arose, that discovery has been completed in the circuit court. We have expert discovery that is remaining, but we're on the cusp of summary judgment. So one of the things we are asking for is simply that this issue be deferred until after summary judgment because it resolves a number of the issues, including issues that touch upon the dual representation argument that Mr. Janosik makes. Because, as I will explain in a moment, there's neither dual nor representation here. Okay, why don't you get to that issue? All right, the issue of dual representation, Your Honor, as I mentioned, is simply a misnomer. Mr. Janosik has argued here, and he's argued below, and the circuit court found that the defendants couldn't possibly maintain a privilege as to him because there was a joint representation or a dual representation. That is just simply not the case. There is no indication that the counsel for Big and the Slockys had a representation relationship with Mr. Janosik. So there is no dual representation. Therefore, the entire doctrine cannot apply here. Likewise, the case that was relied upon very heavily by Mr. Janosik is the Mueller case, for the same reason the Mueller case simply doesn't apply here. If this were the Mueller case, counsel for Big and the Slockys would be arguing about whether or not the Slockys could maintain a privilege and protect communications and disclosure as to the company. But the company is not here trying to pierce or undermine the privilege. Big and its counsel are here arguing to this court that the privilege should be maintained, and it is Mr. Janosik who should not be allowed to pierce or undermine the privilege. This case couldn't be any different than Mueller, so the dual representation doctrine simply does not apply. Secondly, the argument that there was no expectation of privacy or confidentiality with respect to communications between the Slockys and counsel for the company also does not undermine the privilege. Again, because there was no dual representation. Before you wrap up, because your time is getting close, I think, I would like you to address your due process argument. The due process argument, Your Honor, is simply this. That the circuit court found, because in the opinion, the October 14, 2011, discovery order, the court said it finds as follows, and made certain findings, such as Big consists of three members, that Mr. Janosik is a minority member, that the defendants began working adverse to Janosik, and that certain documents included in the defendant's privilege law did not ask for assistance in communicating something back to Catty. But there had been no evidentiary hearing on any of those issues. The court found facts without finding facts. And to do that, we have to cite any cases that would hold that the court can't make any kind of findings at this stage in the discovery proceedings to determine whether or not a privilege applies. Because the case you cited, quite frankly, you know, I didn't know where that was coming from. You cited the NRA RC case? Right. The point of the NRA RC case, Your Honor, is simply that it lays out the only Supreme Court's description of what due process is in this state, and what the requirements are, and what the test is for due process. But the real point of NRA RC is that, as the only way the Supreme Court found there, it is unconstitutional to make a factual finding without an opportunity to be heard on that point. There was not an evidentiary hearing on Mr. Janosik's status. That case involved the constitutionality of a statute in which a baby was being taken away from a patient with psychiatric problems. How the heck does that relate to what we're talking about here? Factually, it doesn't, Your Honor. But the point is that due process has to be respected, and there was no process. Not even necessarily the adoption stuff and the status of the mother, but, you know, just the issue in that case was they were trying to declare that a statute was unconstitutional, and the Supreme Court said that you can't do that without going through certain steps in order to satisfy due process. I just am having difficulty in understanding the nexus between that case and this case. In NRA RC, the court ultimately found that the lower court should not have found that the statute was unconstitutional as applied in that case without actually having a factual hearing on what its application would be. So the analogy that we draw here is that the circuit court in our case basically found, for purposes of a discovery order unnecessarily and prematurely, in our opinion, that Mr. Janosik is a member of BIG for purposes of compelling the production of privileged communications, but we never actually had a factual evidentiary hearing on that point. A fact was found without finding facts. Okay. That violates due process. I guess the question that I think is still unanswered is were you ever able to find a single case that you could direct us to that would indicate that the court, in the middle of a discovery dispute, is obligated to have an evidentiary hearing before the court can make a ruling on whether or not a privilege applies? Not with respect to privilege and discovery, but we cited a case, it was Bean v. Bean, where the question was the jurisdiction of the court, very similar to this issue, where the issue of whether or not the individual's membership in the entity was inextricably intertwined with whether or not the court had jurisdiction. And the court, in that case, which is what we're urging happened here, is that those two threshold issues be resolved at the same time. So the question of jurisdiction in Bean v. Bean, which was a district of New Hampshire case, was deferred until either summary judgment or trial, when the court would have the opportunity to actually have an evidentiary hearing on the person's status and then deal with the jurisdiction question. In that case, though, there was not an admission by the defendant in their pleadings that, in fact, existed. I don't believe that we have the same fact pattern in there as we do here, Your Honor. But again, with respect to the admission, the problem that we have is for purposes of the privilege, which is, yes, this is a unique situation as far as I understand. I just think you're leaning on a rather slender reed when you're coming in, relying on NRA RC and a case from New Hampshire that don't really square up on the important admission issue on one hand, and the other one, the RC case, has to do with the constitutionality of a statute where the court has to make some findings. So I'm having difficulty following your legal argument here. I understand why you don't want to give up the documents, but I'm looking for a little more support in the case law. Well, let me just address the admission. And then, obviously, we have also made other arguments as to why Mr. Janosik, regardless of whether or not he's a member or not, is not entitled to the documents. And I know that Ms. Daniels will have an opportunity to speak to the issue of control group and the effect of the Montgomery decision and our encouragement that this court adopt that same reasoning here, that even if he is a member, he should not have access to the types of privilege, attorney-client privilege and work product privilege documents that we're talking about. But the point of the admission, Your Honor, is that there would be one thing if we were talking about the merits of the case, but we're not. We're talking about whether or not privilege documents are produced to someone who may later be determined to be someone who shouldn't be receiving them, so that there's a risk there that we can't undo. And this is where, if I was going to say balance of the hardships, weighs heavily in favor of the defendants. The risk of severe consequences to the defendants from the privilege documents being turned over to Mr. Janosik and 18 months from now he's determined not to be a member of BIG, and therefore we have now disclosed privilege documents to someone who wasn't entitled to them, which risks not only wavering to him, but it's to third parties. As the Dexia court pointed out, and we quoted that in our reply brief, we have that risk. But on the flip side, there is no harm to Mr. Janosik to waiting to summary judgment. Mr. Janosik cannot and will not tell you in this courtroom that he must have any of those 851 documents in order to make his case. He can't. The circuit court did not look at them. Obviously, Mr. Janosik has not looked at them. Did you ask the court to conduct an in-camera hearing? With respect to some of those, yes. With respect to the documents that we withheld in the Browns Administrative Agency, which the circuit court did not, but as to the rest, we weren't advocating for a number of reasons. Number one, there are 851 of them, but it wasn't necessary because legally there was no reason to because categorically they should not have been produced to Mr. Janosik. I only say that because I believe in your brief you sort of chide your opponent for the in-camera inspection issue, saying that they didn't ask for it. I don't recall. Well, candidly, Your Honor, we don't believe it's necessary because, again, categorically these documents are the type that Mr. Janosik has no right to see. Okay. Why don't you wrap up and then we'll hear from your colleague. All right. Well, Your Honor, very briefly then, again, what makes this case different than many others, and in many respects it is unique, we're dealing with an LLC. We're dealing with the issue of privilege. We're dealing with the issue of the plaintiff's status or non-status as a member of an entity as one that is inextricably intertwined with the merits on the case as well as this privilege issue. So there are many unique aspects to this case. But just from a common-sense approach, what the Circuit Court should have done was follow the reasoning in Bean v. Bean and deferred this matter until there was an opportunity for an evidentiary hearing or a real fact-finding opportunity, and here it suggested a summary judgment. Summary judgment is something that we are on the cusp of. And then it would have been far more responsible, if necessary, to address this issue. This was done prematurely. It was done unnecessarily. And it was done without the factual basis that would be necessary to support the exceptional access to attorney-client communications and attorney work product. And, again, I would refer this Court to its decision in Garvey for laying out the standards of what, for example, a member of an entity needs to establish as part of a proper purpose in order to obtain this kind of information. So even if we're talking about a request under the LLC Act, as a current or former member, and Ms. Daniels will speak to Montgomery and its effect, but even if we were talking about a former member who was asking for access to information for while they were a member, the period that they were a member, they still have to make a request. They still have to demonstrate a proper purpose. None of that was analyzed here. None of that was demonstrated here. And there's even higher showing for the types of information that we're talking here. So for all those reasons, we ask that this Court reverse the decisions of the District Court, both with respect to the discovery order as well as to the contempt order and the fines associated with it. Remand back to the Circuit Court for directions that this issue with respect to access to privilege should only be addressed, if necessary, after there has been a determination on the merits of Mr. Genovese's status, either as a member or a non-member of Bureau's Investment Group. Thank you, and I hope to see you again in reply. Okay. I hope he left you something to talk about. Yes, I believe so. Okay, good. May it please the Court, Counsel, my name is Genevieve Daniels, and I represent Bureau's Investment Group, LLC, or BIG. In addition to the arguments made by Counsel for BIG 3 and Michael Slackey, Donosek is not entitled to privileged documents, even for the period where the parties agree that he was a member. Because, as I will be arguing today, giving him access to these documents is contrary to the plain language of the LLC Act, Section 10-15A, as well as Illinois case law, and in any event, Donosek forfeited any right he may have had to the company's privileged materials, if any, once he became adverse to BIG in April of 2009. Furthermore, the Circuit Court erred when it refused to apply the ministerial agent exception to BIG's transmission of privileged communications to its master servicer, TBI. For these and the other reasons argued by the appellant's counsel today and in their briefs, BIG requests that the October 14, 2011, discovery order be reversed, that the matter be remanded for further proceedings to determine Donosek's membership status in BIG at summary judgment, and that the November 18, 2011, contempt order against BIG be vacated, as it constitutes a good faith effort to secure an interpretation on the matters in question herein. With respect to the judge's finding that even for the period when the parties agreed Mr. Donosek was a member of BIG, that he was entitled to the materials because there was no expectation of confidentiality or privilege, because he was a member of the control group, that, as the first error, does not comport with the plain language of the LLC Act. The LLC Act provides that former members that make the request for documents must show a proper purpose that the company will evaluate. The Circuit Court only looked at the first half of the sentence and completely read outside of the statute the need for showing a proper purpose, basically giving Donosek unfettered access to BIG's privileged materials. Are you suggesting that he wanted them for an improper purpose? Judge, the record is, there's no discussion of what the purpose was. And I think, first of all, the way that the statute is written, it does put former members in a different category where that is part of the plain language of the statute. And, in addition, there's no, he is now adverse to BIG. There's no question that he has sued my client since April of 2009. They locked him out. They changed the locks, didn't they? You know, you talk about being adverse. I mean, everybody's adverse here. There was no, you're talking about out of the building? Yeah. The building where BIG is located, there are also other entities, including TBI. Once he ended his relationship with the president of TBI, he was no longer given access to that building. It's a separate issue on whether or not he is a member of BIG and his participation in that entity. But my point is, I mean, you talk about being adverse, that he was adverse because he filed suit. You were adverse to him when he was no longer wanted on the premises, right? Well, obviously the relationship had changed between the parties. And the adverse relationship affects whether or not he can obtain documents from my client that are protected by the privilege, especially when there were products. But wouldn't you think that it would be a proper purpose for somebody who is working there as of September 30th and is involved in the business and is getting 40 percent of it, and then a day later he's no longer allowed there, is no longer allowed access to the premises, no longer has the job and wants to sue to protect his rights, wouldn't that be a proper purpose to get access to the records to make sure that he gets his fair share out of the LLC? Potentially, but there has to be a request for the records and he has to show a proper purpose. It also goes to what constitutes a record under the LLC Act, the provision at issue. It's not every scrap of paper. The company is entitled to its privilege. It holds the privilege as the entity. It doesn't belong to any of the individual members or former members. And, again, the circuit court did not do any review of this. Well, the privilege is the exception. I mean, in the lawsuit, there's discovery you're allowed to get the materials that you want to get. And if you believe that they're not entitled to them because of the privilege, you're the ones who raise the privilege, right? That's correct. And in this litigation, tens of thousands of documents have been turned over. We're only talking about a very small number of items that were put onto a privilege log. So there has been production. Sorry to interrupt. Go ahead. Thank you. Not only did the circuit court not read out of the statute of the LLC Act the proper purpose requirement, he also gave unfettered access to Biggs Privilege materials by misapplying this court's 1994 decision in SPSS versus Carnahan Walsh and held that as a former member of the control group, Genosik shared in the company's privilege and, therefore, was entitled to these documents. SPSS does not apply here and does not reflect the current state of law. First, SPSS did not evaluate the LLC Act. It related to a corporation and, moreover, the proper purpose requirement in the LLC Act was added in 1998. And that was four years before or four years after, excuse me, the SPSS decision came down. Indeed, Illinois cases by this court subsequent to SPSS make it clear that it's the entity and not the individual constituents that hold the privilege. And we have cited in our brief the case of Hayes versus Burlington Northern. In addition, there's the cite to Torres v. Divas. The attorney represents the company and not the individual incorporators, even though one of the incorporators approached counsel to do the legal work for the entity. And the professional rules of conduct also make it clear that an attorney representing an organization represents the organization itself and not the constituent members. As such, SPSS in similar cases that espouse the concept that there exists some type of collective entity client that can also potentially take an adverse position to the entity's management regarding matters of privilege underlines this concept in Illinois, namely in the Hayes case, that it's the entity that can control and waive the privilege, not its constituent members or former members. Indeed, when the Northern District of Illinois in the 2004 case of Dexia Credit Local versus Rogan analyzed whether the former control group members continue to share in the entity's privilege over the materials generated during their time in the control group, that court found Hayes persuasive and that if the Illinois Supreme Court were to deal with this issue, it would find access to privileged materials ends when an individual leaves the control group. The circuit court committed error when it held that SPSS and not Dexia governs the control group analysis for purposes of access under Section 10-15A. The circuit court also further erred in finding that Janosik was entitled to privileged materials given his adverse position in this case and that he forfeited access to these documents once he became adverse to FIG in April 2009. This is true regardless of whether Janosik is a current or former member. And for that proposition, we have cited a 2008 Nevada federal district case that we think is instructive, Montgomery versus E-Tropic, for this proposition. It represents the current trend, citing Dexia, which in turn had cited Hayes and other similar recent cases in addition to U.S. Supreme Court authority. Finally, with respect to the ministerial agent exception, we believe that the circuit court erred in not finding that that exception applied here. TBI, the Bureau's Inc., is a master servicer for BIG and a number of other entities. BIG does not keep any documents. Give us just a little factual background on specifically what a master servicer is. Do they go out and try to collect the debts? Yes. Okay. Yes. Basically, they service a number of entities, including my client, BIG, and they do the administrative function. They take care of licensing. They take care of collections, hiring attorneys. They maintain the documents on their system. They are the administrative arm. They have a contractual relationship where they perform that function. Therefore, maintaining the documents, including documents that were forwarded to them as the master servicer, come right within the ministerial agent exception. And for that proposition, we have cited Abbott Laboratories versus AERCO, and we believe that the circuit court erred in not finding that exception applied. And are there any other questions? No, I think we're okay. Okay. If I may sum again, we are asking that this court reverse the October 14, 2011, discovery order and that the matter be remanded for further proceedings to determine genosis membership status and that also the November 18 contempt order be reversed. Thank you. Thank you, counsel. Thank you. Good morning again, Your Honors. My name is Tom Kaniok. I'm with Karen Jeffries. We represent Jim Genosik. The point here is that in Illinois, we do a balancing test when applying an attorney-client privilege. We have to look to the policy concerns regarding, as you were pointing out, getting at the truth as opposed to applying the reasons why we have a privilege. And as you noted, it's an unequal balance because the exception is the privilege. There's a reason we do that. It's because we don't want to look at this wouldn't we, like the Taylor Court said. And I think that's exactly what's going on here, is that the appellants want you to look at this wouldn't we. They want you to apply the search for the truth narrowly, and they want you to apply the doctrine wouldn't we. And when what we need to do is look at the reasons, the context, why is it that we do or don't want to apply a privilege in any given case. And with due respect to counsel, I didn't hear a lot of facts about the underlying allegations. That would have been nice to hear. So I'm going to have to take a second and do that. What did Jim Genosik allege? He's a member of a member-managed LLC, and it appears that you're up to speed on that. It's not a manager-managed LLC. It's not a partnership. It's not a corporation. It's not a corporation. He has a statutory right to as much management and information as the parties do. That's alleged. That's clear. It's judicially admitted by both sides that he was a member, certainly up until October 1, 2007 when he was frozen out or locked out. Okay, we know that. But what about substantive allegations? We didn't hear anything about that. He had his allegations. He was frozen out. He lost management. He lost money. But he has highly colorable derivative claims that the Slotgees set up another company. I don't want to minimize that point. I think it needs to be emphasized. Trust me, it's in the briefs. We understand it. It was in the pleadings. It's in the record. And what he is basically complaining about in large part is that he was part of this company. It was doing well. He had a 40% interest in it. All of a sudden, everybody falls out of love. Another company is set up. That gets all the new business. The only business that the original one gets to do is the stuff that's already on the books. And his 40% and the other stuff is evanescent, up in the air. We get it. Said better than I could. The point, though, is that for purposes of the attorney-client privilege, we have highly colorable derivative claims. This isn't a fishing expedition. The issue of his membership is very much in play. During oral argument, I just heard statements that there's a finding that he is a member, and then there's, well, we have to go back down to the lower court so that we can have the finding that he's a member. You've got to give him this. At least part of that is brought on by the fact that he says, I am, I am not, or I am, or I used to be. Let me address that. So why should you be able to have your cake and eat it, too, on that pleading issue? Because there is a distinction between taking an inconsistent litigation position, freezing somebody in and out. That's a minority oppression case. Freezing them in in your pleadings and freezing them out with the attorney-client privilege. There's a big difference between that and properly and consistently pleading in the alternative. They're very different things. In fact, I want to get at something the counsel said. He talked about not being able to establish the need for these particular documents. I will address that. What are the allegations that Jim has made on this point about pleading in the alternative? Here's what he's saying. I don't know if legally I'm still a member. I think I gave my express will under the act and under the operating agreement. The Slockys say, no, the operating agreement has notice requirements. You didn't give proper notice. You're still in. We say, then we were wrongfully expelled. Dissociated. An issue that has come up in the briefs. It's down below. And what we need to know is, why did the Slockys think that it was acceptable to string him along and to freeze him out? That's the issue that they're saying needs to be resolved in an evidentiary hearing. But aren't we entitled to know what the Slockys knew in order to have that evidentiary hearing? Aren't we entitled to know what the role of Catton was? They prepared the resolution. Are we to pretend there was no discussion about the preparation of this resolution? Big Three was set up by Catton. Was there no discussion with Catton about why Big Three was? They have a role here that needs to be explored in order to resolve the very issue they say they need an evidentiary hearing. He says that, you know, while this case has been puttering along up here in the appellate court, discovery has been moving apace in the lower court, and you're on the verge of having the discovery to the point where you can file dueling motions for summary judgment. When, first of all, party discovery is closed pending this court's resolution of this issue, it was never. No, I think you don't have to say that. That's understood. But, you know, putting this aside just for the moment, isn't there, you know, to take his position that may be stated inartfully, isn't there enough information there now in the record and all the discovery that has been completed over the course of time for the court to make this determination as to whether or not he is or he's a used to be? The simple answer is no. The more complex answer is because these documents go to that issue. The trial court, regardless of what the current level of evidence is, these documents go to that issue. Even the ones that are just up to October of 2007? Well, certainly those documents would because those would be the documents on the, I mean, that's right when he was frozen out. I would think we would be focusing most intently on those documents to be sure. Okay. I don't want to derail your argument, and if you want to go somewhere else, please feel free to do so, but I would like the benefit of your take on the difference between the two periods of time that we're talking about. Up until the date that he's still there physically and, you know, working at big, that's one point in time, and from that point in time up until the time that Catton is disqualified, isn't that something that we should be very careful about in light of the recent precedent in the Garvey case? Of course you should. And my whole point is to say you have to do a balancing act. They have a point here. I mean, I would be like an ostrich with my head in the sand if I didn't acknowledge the fact that that's problematic. Let's talk about that. If it's convenient, let's talk about that second period of time then. Okay. I'll talk about that first. Thank you. What I was going to do is take the first part of the reasoning involving pre-2007, but I'll do the second one first. You're on your dance floor. I mean, it's your argument. I don't want to. I'll do the second one first. Okay. What Judge Palmer is saying is that the problem is, they call it the dual representation doctrine under Mueller, but it's really the reasonable expectation of confidentiality doctrine. There was never a time with this firm, Catton, given its relationship representing one set of insiders in the firm, there was never a time when anything that that firm had to say that had anything to do with this business wasn't something that Jim could see also. There was never a time when they were under conflict of interest. It wasn't until resolution of the conflict of interest that you could say, okay, Jim is now outside the tent. That's the moment at which he's outside the tent. And that moment is the date of disqualification because that's the first time, to put it in their terms, Jim manifested an intent that they should continue to do that. The disclosure of those documents or denying the privilege for those documents, in your judgment, would not offend the holding in Garvey? No. And, in fact, I want to get right into Garvey. Okay. What I want to say about the dual representation doctrine is Mueller is not an outlier case. And, in fact, I think Mueller was a simpler case than even the Mueller report made it. It followed the law. It's sort of complex. It does. But it shouldn't. Because, well, first of all, they address a lot of other complex issues, like the fiduciary duty exception that's not before the court. Fifth Amendment. Right. But when it comes to the dual representation doctrine, I don't think it was that complex. It followed Supreme Court case law on consolidation of coal waste management. And it's consistent with the case law that came after it, the Garvey case. This case, do you notice it, is the Garvey case. That is the Garvey case. But not for the reasons they say. What happened in Garvey is what happened in this case. We had a firm in that case. I think it was Safarth? Right. Safarth represented an entity and helped one set of sibling insiders. Right. It was a family deal. Right. And when they realized that the other set of sibling insiders, that they were having problems, Safarth did the right thing. They did what, with due respect, I think Catton should have done. They sent out a letter. And the letter said, you want us to represent the company. We have a conflict of interest. And I have to explain the conflict of interest. And in the letter, Safarth says, by the way, all the documents, the communications are probably producible. And they were right. They were probably producible, as they are in this case.  And so, the company, they file a suit against each other. And then the one set of insiders filed a separate malpractice action against Safarth. And in that case, they want all the documents between Catton and its lawyers on that case. That's a whole different animal. And the Garvey court made the point of saying dual representation documents announced in Mueller is different because those were people external to the firm. Now, if the Slockys sue Catton for malpractice because of the conflict, then Catton is going to cite the Garvey case quite appropriately and not have to produce any documents between it and its own lawyers. Okay, we can accept that. But what did the Garvey court do with the argument about the underlying documents? The Garvey court said, and by the way, the documents you're talking about in the chancery litigation have nothing to do with your malpractice action. They were entitled to and did, in fact, receive them. Why isn't this case just like Garvey? We're entitled to and should, in fact, receive any communications during the time period for which Catton had a conflict of interest that was not yet resolved because Jim was inside the tent at that point. It wasn't until that moment that he was outside the tent. Well, he's certainly technically within the tent even though he wasn't getting a lot of communication. It is our argument that he should have been inside the tent. Right. And so, therefore, that's why the Mueller case is on all fours as is the Garvey case. But let me go back, if I may, and revisit the first issue. First period of time. Okay. This is the simpler one. Evidentiary hearing for what? There's judicial admissions. We don't do evidence on judicial admissions as a matter of policy. We know it's a member-managed company. We know the statute says it has management and communication rights. It's all before the court. We know that the statute says, we didn't hear the whole statute just now. It says former members and their attorneys shall be entitled to see the documents if a proper purpose. Shall. That means the discretion lies with the former member. It doesn't lie with the company. It's Jim's decision and he exercised it. Attorneys. Clearly, litigation is an issue for a potentially proper purpose. And what about the records? I have it in the brief, so I won't commit the sin of quoting a brief. But it's a very expansive definition of what the records are. And proper purpose. Every case cited by both sides, including the Espinoza case out of Delaware, said it's a proper purpose. The issue in Espinoza was different. The issue in Espinoza was the court said, well, you know, in camera and based upon representations, that document, it actually was a fact that the document had nothing to do with the issues or with the proper purpose. So that case is support for the proposition that looking out for your own interests in litigation is a proper purpose. So we have a proper purpose. That's all Judge Palmer needed. He didn't need to say anything. Those links in the chain of reasoning were enough by themselves to affirm him. But he addressed this elephant in the room, this dichotomy in thinking between like Kirby and Gottlieb as opposed to Montgomery and Fitzpatrick and Dexia. Now, I'd like to address that. It was not necessary for the court to do so. Judge Palmer quite appropriately called me to task when we had oral argument when he said, look, I see what SPS says, but they were a little light on reasoning, weren't they? And the only proper answer I could give was yes. All they did was cite to Gottlieb without any explanation, which is why I'm not making a big deal out of the SPS. SPSS case, pardon me. Although it did cite to Gottlieb. Here's the problem. Kirby, well, let me back up. Let me put it like this. Both sides on this debate can claim common sense. Both sides have a legitimate point. The Montgomery court, the Fitzpatrick court will say, everybody knows that the attorney-client privilege belongs to the entity. And since everybody knows that, it's a matter of common sense. While the Kirby and Gottlieb courts, everybody knows attorney-client privilege doesn't attach if there's no reasonable expectation of confidentiality. Well, that's a matter of common sense, too. In Illinois, we balance by looking at the particular facts and context in front of us. In this case, it's a lot more like Kirby. The Kirby court did something that, to be intellectually honest, I have to say, they caught a lot of slack for. They came up with something. They had a whole clause that they called the joint client rule. And a lot of courts, since Kirby, have come down kind of wrinkling their nose at the notion that there's a joint client rule. But the policy reasons underlying the decision were solid. Insiders, status as an officer, debate between people who are insiders, derivative claims. This is not a shareholder who buys a share of IBM so that they can do a strike suit when they were never subject to any control group issues or attorney-client privilege or rights to hear what the attorneys had to say. What is it between the insiders? The Gottlieb court, I thought, actually did a better job on this and said, it is akin to the common interest doctrine. It's not the common interest doctrine, but it's just like it. Two people hire a lawyer to form a company. Anything that lawyer says about the company to one of the persons, the other person gets to know, even if they weren't there. That's settled bedrock law. Nobody's going to debate that point. And that's what Gottlieb was saying. And here's what I really want to leave you with, an important point. Montgomery Fitzpatrick. I like the Montgomery case. Because Montgomery, at least the court, was trying to say, does it matter that it's a corporation, that it's an LLC, that it's a partnership? And, of course, none of the cases cited by anybody deal with a member-managed LLC. None of them. But at least they tried. And they came down and said, well, we kind of think that the right to select counsel is going to trump, generally speaking. But they made the point of leaving the door open and specifically said, of course, this isn't a case where there are claims being brought derivatively on behalf of the company or where there are issues involving the fiduciary responsibilities as a former member. Remember that? That quote's in the brief. They left the door open because they recognized that in the right case, that it's going to be a different issue. This is that case. And what about Fitzpatrick? The Fitzpatrick court went so far as to add a footnote at the very end where they said, well, of course, if the company, if the lawyers represented the company and some of the insiders, they actually used the Kirby term. In that case, there would be a joint client relationship. So the Fitzpatrick court, at their line, actually used the term that so many other courts find offensive. What I'm suggesting to this court is that, with exception, which I'll talk about at last time, every court in the land would affirm Judge Palmer in this case because it's not necessary to resolve exactly whether you believe in Kirby or you believe in Fitzpatrick. You don't have to do that because all of these courts would agree that, in balance, these are insider issues and there's a protective order in place. And in balance, it appears there's a significant issue about who paid Catton's fees, an issue the Mueller court said would influence them, and Catton refuses to say whether they were paid by Bing, which would have come out of Jim's 40% profit. You put all this stuff together. There's one court in particular, though, that I have to say, as a matter of intellectual honesty, the Dexia decision. I think the Dexia magistrate, with due respect, went wooden. There seems to be very little flexibility in that decision, and I found that very problematic because he didn't leave the door open to the right kind of case. And so I think the Dexia court misread SBSS, at least the simple citation to Gottlieb, misread Gottlieb, misread all of the case law and came down a little too harsh. And so I'm not sure what the Dexia magistrate would do, but every other court would affirm Judge Palmer in this case because of the insider issues. Jim is in the tent. Not that it was really necessary to even address the issue on the first part of the reasoning about the prior documents. Okay, if you can wrap up. Sure. The only other thing I wanted to address was the notion, the one thing on the scale about selecting counsel. First of all, the Slockys don't have a right to assert the attorney-client privilege. It's only Big does. And this is an awkward thing for me. I like counsel personally, but I'm not doing my job unless I point out that Jim had no say in the selection of current counsel for Big in this case. Why is Big taking sides? Given the nature of these derivative accounts, Big will make millions. It is in the best interest of Big to pursue this. Well, I think in the scale, the fact that a lawyer selected by the Slockys has announced that they want to assert a privilege doesn't get a whole lot of weight, given the context and facts of this case. So I urge the court to affirm Judge Palmer. We never discussed the ministerial agency issue. Quite frankly, I think both sides dealt with it fully in the briefs. Unless there's anything else, I'll step down. Thank you. I'll tell you when we've heard enough. Fair enough. Thank you. We'll allow your colleague to follow up. I appreciate it. Thank you. We don't have another case pressing us, but, you know, try to keep it brief.       Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.         Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Again, Martyn Tully, on behalf of Michael Slotkey and Bureau of Investments Group 3. At page 32 of Janousek's brief, he states something that I think is actually quite significant and true. A party is prohibited from taking inconsistent positions because of the risk of jobbing the system by manipulating matter to suit the party's needs at any given moment. Your Honors, this is one of those moments where because of the dichotomy that was artificially created by Mr. Janousek's pleadings, we have a situation that is forcing us to have to fight this in the first place. This isn't a normal – part of the reason why this is such an unusual case is because this normally doesn't happen. We don't normally have the parallel universe that we've been dealing with from day one. I want to go back to the issue about judicial admission because I neglected to mention the Winnetka Bank case that we cited, where basically that court in a similar context said, wait a minute, that's more of an issue of law, that's not an admission of fact. You can't use that against – to decide the issue once and for all. Was that cited in your reply brief? It was in the reply brief, Your Honor. 201-03-373. And there's a discussion of this very point in the reply brief, so I won't belabor the point. But let me point something out that is in the record. Because the problem we have here is that this isn't the first time that Mr. Janousek has jobbed at the system. As I mentioned earlier, we have repeatedly asked for this threshold question of his membership to be decided, and Mr. Janousek has fiercely resisted it. Even today he's resisting it. And the circuit court has allowed him to resist it. I'll give you an example. And this is in the record at C-1397 through 1413, and I believe the order is at C-1537. We moved to compel answers to requests to admit of Mr. Janousek to once and for all tell us, what is your opinion? Because he filed a verified complaint. I heard counsel for Mr. Janousek say that, well, Jim wasn't sure legally what his status was. But he swore to the court that he knew what it was. And so we asked him to answer requests to admit. He, once again, fiercely opposed our motion to compel. And the circuit court, and the reasoning that was given by Mr. Janousek for opposing it, was that that's not a fair question because it's a question of law. It's not a question of fact. So, Your Honor, we have had this situation over and over again of the system being jobbed by Mr. Janousek where he is taking advantage of these inconsistent positions to manipulate the situation to suit his needs at the moment. Don't you, in your opening brief, take the position that it's a question of fact and that the court should have decided it? And then in your reply brief, you come out with that Winefka case and you say, well, no, it's a question of law. It seems to me you're doing the same thing as your colleagues. Actually, two different things. It's a question of fact, which is why we need to have an actual finding of fact, a.k.a. summary judgment or some evidentiary hearing. It could be trial in some cases. I don't know. That's the fact part. The position that we took in discovery or the response to a pleading, that's obviously a question of law because that's exactly what Mr. Janousek had taken the position and that's exactly what the circuit court allowed him to do in denying our motion to compel. So I don't think it's fair for that issue to be used against us for something as important as access to attorney-client privileged communications and work product documents. And yet when we put Mr. Janousek on the spot and ask him, what is, take a side, because you know what, once you pick, it changes what the claims are in this case. There is no count one. It changes what the parties are. Big's not a defendant anymore. And it also eliminates the whole grounds for the disqualification, which I want to touch upon really quickly, because the disqualification of Catton in February of 2010 was only because Mr. Janousek pointed out, after the case had been pending for some time, well, Catton, you can't represent Big as a defendant when I'm also suing Big derivatively. You can't represent the same party in the same litigation. Therefore, you must get out. We disagreed with that. But Judge Palmer thought otherwise, and that was the grounds for disqualification. If Mr. Janousek had picked a side, we wouldn't have had that conflict, and that never would have happened. So there are real serious consequences to this continued jobbing of the system, and this is just another one of those. But obviously on that disqualification point, and again I'll refer back to this Court's decision in Garvey, that while a violation of conflict rules may have relevance for malpractice claims, it has no relevance to issues of whether the documents in question are protected by the attorney-client privilege. So that fact could not have been a ground for the waiver or the requirement of disclosing any privileged communications in this case. Counsel for Janousek said on several occasions in one way or the other in his argument that Jim has as much access to information at Big as anyone else. Well, that begs the question of his status, which is our whole point. Counsel for Janousek said several times, Jim's in the tent. Well, but I think he's saying it on the basis that whether he is a current or even as a former member, the type of LLC that you have here, that he has the right to that information. Well, if we're talking about his current status, the question is it begs the question of whether he's in the tent when he was in the tent, because it changes the analysis. It changes the timeframe. It changes the analysis. It changes what has to be demonstrated. We have to know that bedrock answer, is he or isn't he, or as you put it, Your Honor, is he a current or is he a former? I thought part of the issue is the differentiation between being a member of Big and being a member of the control group because he was the president of KBI. Well, Your Honors, let me explain something. KBI and Big are separate entities. I understand that. So his role as a president of KBI has nothing to do with Big. I understand that. He was specifically fired as the president of KBI. So up until that point, he was clearly a part of the control group of TBI, and it was my understanding that he was also clearly a member of the control group of Big. Let me address that, Your Honor, because I'm glad you asked that question. What is the control group of Big? And I would encourage the Court to look at the operating agreement for Big because Big is made up of three people. But it's an LLC. It's an LLC. It's absolutely a member-managed LLC, but the operating agreement says two things that are significant. One, that the actions and decisions of the LLC will be made by the majority of the members. The control group is the majority of the members. Mr. Janosik would have you think that the control group is everyone, in which case, what is the control group? The operating agreement speaks to the majority making the decisions and acting on behalf of the LLC. The majority members are the best thing we have to a control group. And furthermore, there's a provision in the operating agreement that talks about that the entity must maintain books and records. It doesn't say the members will maintain books and records. It says the majority of the members will maintain books and records. The operating agreement itself, which is Section 8.2 on books and records, a majority of the members, not the members, but a majority of the members, shall keep or cause to be kept complete and accurate books and records of the company and supporting documentation of the transactions with respect to the conduct of the company's business. What I'm suggesting is that the operating agreement... Somebody did, right? Somebody did keep records? Well, yes. That's why we have this privilege log of all these documents, right? Yes. And who were the people who were keeping those records? Well, that was outsourced. I'm sorry? That was essentially outsourced, Your Honor, to TBI. VIG has no employees. It has no computers. It has no administration. So it was basically done administratively by TBI. And Mr. Jancic was the president of TBI. Right. So he had, I would say, access to those records. In his capacity as president of TBI, perhaps, but I'm not following, Your Honor, as to how that would allow him access as a member of VIG. I mean, maybe perhaps physical access. But we're talking about his legal rights, which is the question. And particularly, what is the access to... I mean, are we talking about... We're talking about attorney-client privilege communications. We're talking about attorney work product. I'm not suggesting that TBI had file drawers full of our work product, for example.  And if I am, I apologize. I think it's a spur ramp in any event, so why don't you wrap up. Fair enough. We don't need to go into it in more detail, but I will simply say that we urge the court to adopt the reasoning in both Dexa and Montgomery in terms of the privilege being that of the entity and not of any of its members. And once someone is no longer in the control group, which, again, begs the question of what is his status. Is he in the control group or not? Whether he has any right to obtain information for any period of time. We need to know the answer to that. Dexa and Montgomery set forth the better view of the law, which is that it's the entity's privilege and only the entity and its management, current management, can waive that privilege and a dissident director like Mr. Janosik or the equivalent of a dissident director like Mr. Janosik cannot pierce or undermine that privilege against the will of management. And here the majority of big is essentially its management. The operating agreement says as much. And finally, I just want to wrap up with the practical resolution to this whole issue. And I think Your Honor touched upon it earlier. We're at the cusp of summary judgment. There is no need to decide this issue for a factual or legal basis for the purposes of a discovery dispute. And again, documents that in the ordinary course an opposing litigant would have no right to access. I never heard counsel say once of anything in those documents that he needs in order to make his case because he can't. He said all along that he has what he needs to make his case. Access to privileged documents in the ordinary course an opposing litigant would never have access to is something that he would have to demonstrate an extraordinary showing in order to obtain. And again, this Court is very familiar with the Garwood decision, but with respect to attorney-client privilege communication, there has to be a showing that the documents that they're seeking are essential to the stated proper purpose. We've seen none of that, much less an analysis of that point. Second of all, in the Garwood decision, it pointed out how for attorney work product, the privilege is much broader. And work product that reveals the mental impressions, opinions, or trial strategy of an attorney is only discoverable upon a showing of impossibility of securing similar information from other sources. Again, there has been no showing whatsoever of that in this case, much less an analysis of it by the Circuit Court. So given the unique situation we have and the type of information that we're talking about, this isn't your routine discovery issue. Again, we would urge the Court as a practical basis to reverse the decision of the Circuit Court, send this back, and to address it, if at all, after there's been an evidentiary hearing, summary judgment on the question of Mr. Janosik's status and date. We thank you for your consideration, Your Honors. Thank you. He charitably gave you a minute. If you need a little more, we'll be charitable, too. Thank you. I appreciate it. I will try and be quick. Just a couple things to follow up on the discussion regarding the judicial admission. The Winnetka case that is recited in both the appellant's briefs is actually in response to it being cited by Mr. Janosik in his brief as support for the proposition that there has been some type of a binding judicial admission. No, I get that. But in the first brief, it was all, it's a factual question, factual question is premature, it's factual. And then in the reply brief, oh, no, it's a legal question. And I understand that your opponents brought it up. Oh, okay. And, again, it's our position that we believe it's a question of mixed fact and lie, whether or not he's a member has to be analyzed with respect to the LLC Act and the operating agreement. That evidentiary hearing has never happened. For the court, it is undisputed that his membership status still remains actively in dispute in this case. I also wanted to follow up, you know, Bigg's role in this appeal here today. The reason why we've appealed is because the entity is here seeking to protect its privilege, mainly because the person trying to pierce that privilege, his status vis-a-vis the entity is an active dispute at this point. And the harm to my client, the entity, if the wrong decision is made prematurely, cannot be reversed, as the court mentioned in Dexia. I cannot unring that bell for my client if the documents have been shared with an outsider. But we don't know what his status is as we stand here today. Even with a protective order. Even with a protective order, because if he's a stranger to the company, then that is the determination. We've still shared it with someone who is a stranger to the company. Explain that boogeyman to me. Pardon me? Explain that boogeyman that you suggest exists here. You're saying that if we give these documents up, then that's it forever. We can't unring the bell, but there's a protective order. That's correct. So the protective order doesn't do anything? No, the protective order handles the treatment of the materials within the proceeding itself, this matter. But it doesn't go to the fact that the documents were shared with someone who's later found to be a stranger to the entity. It gives grounds for potential waiver by Mr. Janosik and third parties outside of the litigation. And I don't think that it sufficiently protects the entity at this point. And, again, to reiterate the arguments today, there's no need to make that decision today. The potential harm is greater, and we can decide his membership status at this point, and that will drive what happens, if anything, after that decision is made. It is not a decision that needs to be made today. So one big is here to protect the privilege of the entity. Second of all, there is no contest that the parties are adverse. That also affects whether or not Mr. Janosik can get access to the entity's privileged materials, regardless of his membership status, especially with work product, as we've highlighted to the court today. And, finally, much is made about the nature of his derivative claims, and that is the benefit to the entity. There is no way that Mr. Janosik can argue that the only person that will benefit by his alleged derivative claims, which, by the way, require him to actually be a member of the entity to make those claims, will benefit anyone but himself. And as the case of Milroy that is cited in the brief says... At least 40%, right? He will get the benefit of that. And it's to the detriment, potentially, of the other party that he's the only one who benefits from that. And, finally, there's no authority that's cited that a plaintiff can bring a derivative action and somehow use that derivative action to yank away the company's privilege as a hook, especially when he's the only one benefiting. And, again, I would draw the court's attention to Milroy and also to Montgomery that discusses that type of situation. And with respect to the protective order mentioned, to go back to that issue, there is a protective order in place now in this particular case that's been amended with the request in part by Mr. Janosik that materials that are produced in this matter are also available in two other matters involving not the same parties. So there's even a further concern with respect to the protective order in this matter that would cause... Is that part of the record of the appeal? No, but just as a matter of background, there is, I think, whether... I think it's hard enough to hang on to the relevant facts. Okay. Much less the irrelevant ones. But I appreciate the information. Okay. We don't think a protective order handles our concerns. Exactly. Yes, thank you. And for these reasons, again, we ask that the October 14, 2011, discovery order be reversed. Thank you. Thank you very much. We appreciate the briefing and the arguments, and there's some interesting issues here, obviously. We will take the matter under advisement, and we'll get back to you as soon as we can. We're adjourned.